## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| JANE DOE,<br>        Plaintiff,<br><br>      v.<br><br>BROWN UNIVERSITY, et al.<br>        Defendants. | C. A. No. 15-239-M-PAS |

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Judge.

Jane Doe, a senior at Brown University, was caught cheating on a take-home exam and admitted as much in a letter to the University's Academic Code Committee. Applying the Academic Code, Brown conducted a hearing and imposed a punishment that was harsher than Jane Doe likely expected, because this turned out to be her second incident of plagiarism in her four years on campus. Despite this history of academic dishonesty, the University permitted Jane Doe to graduate on time with a Brown University degree. Rather than move on from this sad history in her academic career, Jane Doe brought suit alleging various contract and tort claims against the University and its employees about the process and discipline that Brown administered. This Court finds that Brown did not breach its contract with Jane Doe, and that Jane Doe has established no other actionable claims against the University or its employees. The Court therefore grants summary judgment for the Defendants.

## FACTS

The facts relevant to resolving this legal matter are not in dispute.

Brown University's Academic Code is contained in a document entitled "Academic & Student Conduct Codes," which Brown provided to Jane Doe when she accepted the University's offer of admission. ECF No. 1-1; ECF No. 1 at 5-6 ¶ 28. The Academic Code is a concise portion of that document, which lists academic offenses, procedures for Academic Code hearings, and penalties for violating the Code.[1] ECF No. 1-1 at 2.

The introductory section of the Academic Code, entitled "Basic Policy," states:

> Academic achievement is evaluated on the basis of work that a student produces independently. A student who obtains credit for work, words, or ideas that are not the products of his or her own effort is dishonest and in violation of Brown's Academic Code.
>
> *****
>
> A student's name on any exercise . . . is regarded as assurance that the exercise is the result of the student's own thoughts and study, stated in his or her own words, and produced without assistance, except as quotation marks, references, and footnotes acknowledge the use of printed sources or other outside help. In some instances an instructor or department may authorize students to work jointly in solving problems or completing projects; such efforts must be clearly marked as the results of collaboration. Where collaboration is authorized, students should be very clear as to which parts of any assignment must be performed independently.
>
> *****
>
> If a student is in doubt about work in a particular course, he or she should consult the instructor of the course or one of the academic deans

---

[1] The Academic & Student Conduct Codes also contain the Code of Student Conduct, which deals with the University's policies on drugs, alcohol, hazing, sexual misconduct, and other issues. ECF No. 1-1 at 2. This is a separate document, which includes its own list of offenses and set of procedures. *Id.* The Code of Student Conduct, and the issues it addresses, is not pertinent to this case.

in his or her appropriate division so as to avoid the charge of academic dishonesty.

ECF No. 1-1 at 6-7.

The section labeled "Offenses Against the Academic Code" contains the following relevant provisions:

> *Use of Sources*
>
> *\*\*\*\*\**
>
> Word-for-word inclusion of any part of someone else's written or oral sentence, even if only a phrase or sentence, requires citation in quotation marks and use of the appropriate conventions for attribution. . . . Paraphrasing or summarizing the contents of another's work is not dishonest if the source or sources are clearly identified . . . but such paraphrasing does not constitute independent work and may be rejected by the instructor.  Students who have questions about accurate and proper citation methods are expected to consult reference guides as well as course instructors.
>
> *\*\*\*\*\**
>
> *Examinations, Quizzes, and Tests*
>
> In writing examinations and quizzes, the student is required to respond entirely on the basis of his or her own memory and capacity, without any assistance whatsoever except such as is specifically authorized by the instructor.
>
> Cheating on examinations and quizzes can take the forms listed below.  The list is not exhaustive.
>
> - Engaging in other actions that undermine equity and reduce the objectivity of evaluation of student work
>
> *\*\*\*\*\**
>
> - Copying other students' work during an examination
> - Engaging in collaboration or unauthorized assistance on take-home examinations or assignments

ECF No. 1-1 at 7-8.

3

Next, the Academic Code explains the "Procedures for Academic Code Hearings":

> All cases of suspected academic dishonesty in the College . . . shall be referred to the Case Administrator of the Academic Code, who shall be an academic dean appointed by the Dean of the College. Faculty and students are urged to report their suspicions so that all members of the University community will feel equally responsible for academic honesty, and so that repeat offenders may be identified.
>
> The person alleging a violation of the Code shall provide copies of the work in question and describe in an accompanying narrative the nature of the alleged violation. In cases of plagiarism, the person making the charge shall provide copies of original sources, if available, marking plagiarized phrases, sentences, and/or paragraphs, and shall indicate borrowings in the text of the accused and in original sources. In the case of an examination, the person making the charge shall provide copies of the examination in question, indicate specifically the grounds for the charge, and explain his or her process of discovery. Other alleged offenses against the Academic Code shall be documented with equal thoroughness and in equal detail.
>
> All cases of suspected academic dishonesty will be screened by the Case Administrator, in consultation with faculty involved in the case and expert witnesses if needed. The Case Administrator determines whether or not a case requires a formal hearing. . . . .
>
> If, after screening, the Case Administrator decides that a formal hearing is warranted, he or she shall, as soon as possible, notify the accused student of the specific charge(s) of dishonesty, the time and place of the hearing, the nature of the evidence that will be presented against the student, and the range of penalties that may be imposed if the Committee finds that academic dishonesty occurred.
>
> \*\*\*\*\*
>
> *Student Rights*
>
> The accused student is permitted to consult a Brown faculty or administrative advisor on matters of preparation for the hearing, hearing procedures, and possible outcomes. The Case Administrator will provide the accused student with a list of persons from within the University community who, by prior experience and interest, can

provide knowledgeable advice. The advisor is not permitted to attend the academic code hearing except as a possible witness.

The accused student has the right to dispute the evidence against him or her and the right to present evidence and witnesses of his or her own to support his or her case, to examine any witnesses against him or her, and to avoid self-incrimination by declining to answer questions or by declining to participate in the proceedings in whole or in part. Declining to participate in an Academic Code hearing does not affect the validity of the Committee's deliberations, nor does it affect the authority of the University or its representatives to impose penalties if dishonesty is found to have occurred.

*Standing Committee on the Academic Code*

Hearings, deliberations, and decisions on penalties, culpability, or innocence shall be made by a Standing Committee on the Academic Code, consisting of a dean from the accused student's college/school (but not the Case Administrator), plus two faculty members to be chosen from a standing pool of six. . . .

*****

The Academic Code Committee's procedures are administrative in nature and concern internal University affairs, accordingly, the deliberation of the Standing Committee need not be subject to formal rules of civil procedure or evidence. The meetings/hearings need not be open to the public, the accused does not have a right to legal counsel at the meetings/hearings, nor shall legal counsel be part of the process.

*Committee Findings*

If an undergraduate student is determined to be in violation of the Academic Code, the Standing Committee shall determine an appropriate sanction, which will be conveyed to the student in a letter from the Committee. The student will be informed in the letter that he or she has the right to appeal any decisions by the Academic Code Committee to the Dean of the College. . . .

*Appeals Process*

An undergraduate student who has been found in violation of the Academic Code may appeal the Committee's ruling to the Dean of the College. . . . The student's appeal of the Committee's decision must be

in writing and shall include all materials the appellant considers relevant, including a narrative clearly outlining the grounds of appeal.

Normally, appeals will be considered only when new information that was not reasonably available at the time of the hearing becomes available or when an allegation of substantial procedural error on the part of the University or the Academic Code Committee is made. . . .

*Id.* at 9-13.

Finally, the Code also lists the "Penalties for Violating the Academic Code":

The Standing Committee on the Academic Code is authorized to enact any penalty it judges appropriate for a violation of the code. The most common penalties assessed by the Academic Code Committee are described below.

I.     Reprimand . . . .
II.    Loss of credit in the exercise . . . .
III.   Directed No Credit in the course . . . .
IV.    Suspension
       A serious offense may result in the student's suspension from the University for a period of one semester or longer. Normally, the following will accompany suspension:
       1. Permanent record entry in the student's internal academic folder
       2. Parental notification
       3. Withholding of an institutional letter of support for admission to graduate or professional school or discussion of the offense in the letter. . . .
       4. Transcript notation of Directed No Credit in the course and of violation of the Academic Code
       5. Termination of University privileges, such as Brown email access, departmental mailbox, meal card, dorm room, and access to University buildings
V.     Dismissal . . . .
VI.    Expulsion . . . .
VII.   Revocation of degree . . . .

*Id.* at 13-17.

Jane Doe[2] was accused of violating the Academic Code based on her answers

to a take-home midterm exam for Public Health Policy 320, a course taught by

Professor Melissa A. Clark. ECF No. 1 at 8, 10 ¶¶ 39, 52. After Jane Doe submitted

her exam, Professor Clark's teaching assistant alerted the professor to significant

similarities between Jane Doe's and another student's — T.L.'s[3] — exam.[4] Professor

Clark then met with Jane Doe and T.L. independently to discuss their exams. *Id.* at

10 ¶ 52. During her meeting, Jane Doe admitted to collaborating with others on the

exam. *Id.* Professor Clark then wrote letters reporting potential Academic Code

violations by Jane Doe and T.L. to the Case Administrator of the Academic Code,

Deputy Dean Christopher Dennis. *Id.* at 11 ¶ 53; ECF No. 35-2 at 5, 7. In accordance

---

[2] Jane Doe is a pseudonym. This Court granted the Plaintiff's *ex-parte* motion (ECF No. 2) to file her complaint using a pseudonym. ECF No. 3. Brown subsequently filed a motion asking this Court to vacate its order allowing Jane Doe to proceed anonymously. ECF No. 16. Because the Court is entering judgment for the Defendants, it need not reach the question of the Plaintiff's continued anonymity. However, if this matter were to have continued, the Court would have granted the Defendants' motion, vacated its prior order, and required the Plaintiff to proceed identified. Based on the totality of the circumstances in this case, balancing the need for transparent, open, and public court proceedings, with a "risk of unfairness to the opposing party," the Court finds that the need for transparency in this public forum outweighs the Plaintiff's desire for anonymity in this matter. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1068 (9th Cir. 2000) ("a district court must balance the need for anonymity against the general presumption that parties' identities are public information and the risk of unfairness to the opposing party. *See M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir. 1998); *James [v. Jacobson]*, 6 F.3d [233,] 238 (4th Cir.); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir. 1992); [*Doe v.*] *Stegall*, 653 F.2d [180,] 186 (5th Cir.).").

[3] T.L. was another student in Brown's Public Health Policy 320 course. The parties have not publicly revealed T.L.'s identity in this lawsuit.

[4] The two students' answers to exam question # 4 are reproduced in the Appendix following the Court's Memorandum and Order.

with the Academic Code, ECF No. 1-1 at 10, Professor Clark attached the two students' exams to her letters, with "sentences that are identical or nearly identical . . . highlighted in yellow." ECF No. 35-2 at 5, 7, 11-23. Professor Clark also informed Dean Dennis that "[i]n the week prior to the posting of the exam as well as at the beginning of each class period on November 4, 6, and 11, students were reminded that the exam should be completed independently. The importance of independent work on all assignments was also discussed at the beginning of the semester." *Id.* at 5, 7.

As part of his screening process to determine whether a more formal hearing was warranted, Dean Dennis met with Jane Doe and T.L. independently. ECF No. 1 at 11 ¶ 54; ECF No. 35-2 at 9. In her meeting with Dean Dennis, Jane Doe again admitted to collaborating with other students on the exam. ECF No. 1 at 11 ¶ 54.

At the completion of his screening, Dean Dennis informed Jane Doe that her case would be forwarded to the Standing Committee on the Academic Code for a hearing. *Id.* at 11 ¶ 57. Jane Doe then submitted a statement to the Committee, in which she stated:

> I am writing to you to describe what happened on my public health take-home exam. . . . This exam required us to read an article and to answer four questions based on what we had read. On the exam itself, there was no comment that stated students could not work with one another. The class contained probably 200 hundred students, and the majority of the class had broken off and paired up with others to work on this exam. As others were breaking into groups, I only felt it was okay that I did the same, as I felt it would be a disadvantage if I worked alone on this exam. Within this group, we all bounced ideas off of each other.

I met with Professor Clark, and the area she was concerned about was question # 4; However after meeting with Dean Dennis, there is a general concern regarding the whole exam. Firstly, I would like you to know that I did not cheat. ***** When Professor Clark had met with me to discuss question # 4, I had not compared my document with the other individual. However, after comparing my document with the other individual, there are similarities between the two for question # 4. To explain this, while we were working in our group, the other individual had come up with ideas pertaining to question # 4. This is no excuse, but it was late at night, and I was suffering from fatigue as I had so many other work assignments to complete. I was struggling on coming up with innovative ideas for the intervention. I used her suggestions, and when she was explaining them to me, because we had the same intervention outline, the thoughts of whose were whose was blurred. I know this is no excuse, but considering how our intervention was the same, what was said from both of us seemed to be thoughts and ideas of my own. This explains the similarity in the structure and wording for question # 4 . . . .

In the moment, I was so wrapped up in writing that it did not occur to me what was going on.

Once Professor Clark notified me, I immediately reviewed the situation and realized the significance of my mistake. I know the difference between right and wrong. I am a good person who made a stupid decision to collaborate with others. I understand that I put myself in this position and I must take responsibility for my actions. However, I sincerely hope that you can understand where I am coming from and forgive me for my mistake.

ECF No. 35-2 at 25.

Next, the three-person Committee held separate hearings for T.L. and Jane Doe, with Jane Doe's hearing preceding T.L.'s. *Id.* at 30. Dean Dennis was present at Jane Doe's hearing. *Id.* at 29. The Committee began by explaining the charges and the evidence to Jane Doe, specifically focusing her attention on exam question # 4. ECF No 35-2 at 31-32. The Committee explained, "We need to know why, almost word for word, your answer to that question is the same as T.L.'s." *Id.* at 32.

In response, Jane Doe explained that she initially put off the exam, because she was working on other assignments. *Id.* at 33. She was then "asked by a group of people" if she "wanted to collaborate on the exam." *Id.* Seeing "a bunch of students also working in groups and bouncing ideas off of one another," she acquiesced to collaborating with a group of "like, five people." *Id.* at 33, 38. She described this decision as "my mistake in the assumption of being able to collaborate with one another." *Id.* at 33.

She explained that it was not her practice to work with others on exams. For the mid-term, however, Jane Doe said she "knew to independently write [her] own . . . but my assumption was that it was okay to [ask other students] what do you think for this question? And that's what I did, [ ] with a group of four or five people, worked on this assignment [together]." *Id.* She stated that she "knew to complete [the exam] independently, in terms of your own words, but I didn't think it was a problem to bounce ideas off of one another of how to write the — or what answers to give for each question." *Id.* at 50-51.

Jane Doe explained that for question # 4:

> Everyone had the same intervention outline, and [ ] when we were coming up with intervention ideas, [T.L.] was spraying out ideas on how to, I guess, like go through the intervention process. And we were all — we were all in a big room, had all of our laptops out, and we were completing the exam. And — oh, I'm sorry. And you know, she was spraying out these ideas, considering that intervention was the same, when I was obviously taking — when I was writing down my answer, it was more of, well, yeah, like, it's so like — like, this is so simple, like, why didn't I think of this, this idea for this intervention. And there — it was more of — for me, when I was writing it down, it was the blur of lines. I — it was just — for me, it was, like, this is my intervention outline, same as everyone else's in the room, and like, yeah, these ideas,

> like, make sense for what I'm writing down, and that is the explanation
> for Number 4, was we all had — everyone in the room had the same
> intervention outline and the same, like, the same ideas, and what my
> mistake is, is not coming up with new and innovative ideas for this
> intervention process, and you know, just, like, working on this late at
> night, like, I just — it was just a mistake of, like, obviously, assuming
> that I could collaborate with others, but when I saw everyone else doing
> it, I just — I just assumed it was okay, and that is my explanation.

*Id.* at 34-35.

When asked about collaboration on other assignments, Jane Doe explained

that "the nature of the class was that it was okay to . . . bounce these ideas off of one

another, but to write it on your own." *Id.* at 36.  When asked whether there was a

policy on collaboration, Jane Doe replied, "No, I mean, I know from the exam, that —

I mean, [Prof. Clark] said — I don't remember what she said in class.  I'm sorry, I

have been to every class, but I can't remember that far back, but I don't really know

what the policy was on it." *Id.* at 36.

After listening to Jane Doe's explanations and rationalizations, the Committee

told her that "what we're going to wrestle with, is why your answers and T.L.'s

answers overlap so much, almost word for word . . . and there is no overlap with the

others." *Id.* at 38.  To this, she explained:

> Well, that is — I mean, I'm not going to disagree with you on that,
> but I did take a look at mine and T.L.'s and I also took a look at the
> people from my — who were in my study group, and they did have the
> same ideas as me and T.L. for Question 4, and they had the same
> intervention outline as me and T.L. for Question 4, and I'm not saying
> that they should be here, but I'm saying that there was definitely
> overlap between everyone in my group.

*Id.* at 38-39.

11

When pressed to explain why Jane Doe came up with the exact same sentences as T.L., she explained, "I wasn't coming up with the same sentences. It was she was spraying out these ideas for the intervention process, and like, what — like, this is what we should do for this; this is how — like, that's how there was similarities in the sentences and the structures." *Id.* at 42. Jane Doe admitted that out of the five people in her group, only she and T.L.'s answers were identical. *Id.* at 44. She admitted that T.L. "would come up saying her — like, how she was going to say it and then, like write it down, and I was in the process of also writing it down." *Id.* at 47. She also admitted that T.L. and "one of the other girls" were leading the meeting when they were working on the exam. *Id.* at 48.

At the end of the hearing, Jane Doe made a final statement:

> [O]ne thing that I want for everyone to understand is that I misunderstood or made the dumbest mistake in assuming that it was okay to collaborate, and that is my fault. And I do take full responsibility on that, but I'd really like to continue my academic career here, as I only have one semester left, and I am really looking forward to my classes next semester, and I'm almost done, and I'd really like you to take that into consideration. And again, I'm sorry, but I did not — and I did not cheat, because I was receiving an A in this class. I had no reason to cheat, and I was really busting my butt off in this class, considering it's more for my concentration, and I'm just — I'm sorry. There's nothing else I can really say, but I'm sorry. And I just really would like to continue my term here at Brown, as I'm almost done, and I have one semester left.

*Id.* at 48-49.

Later the same day, the Committee held T.L.'s hearing. *Id.* at 59-79. The Committee found that T.L. violated the Academic Code "by sharing information about the midterm exam," and penalized her by assigning her a loss of credit in the exercise

and by placing a permanent entry in her internal academic record about the violation. *Id.* at 80. The Committee stated it will notify her parents, and that the violation can be mentioned in an institutional letter of support. *Id.* at 80-81.

The Committee found that Jane Doe also violated the Academic Code "by making unauthorized use of the work of another in taking the midterm exam." *Id.* at 85. After determining that Jane Doe violated the Academic Code, but before deciding on the appropriate discipline, the Committee was informed by Dean Dennis that Jane Doe had a prior Academic Code violation while at Brown. *Id.* at 85, 110-115.[5]

In December 2012, in her junior year, Jane Doe was found to have plagiarized papers in two history courses, including one paper where "she simply copied whole paragraphs from www.sparknotes.com." *Id.* at 110. During the investigation into this incident, Jane Doe submitted a statement acknowledging and apologizing for the violations, and explaining that she "plagiarized sentences out of a lack of confidence in [her] own work." *Id.* at 111. The Committee found that Jane Doe violated the Academic Code, and penalized her with: 1) a permanent entry in her academic folder; 2) parental notification; 3) a transcript notation of a violation of the Academic Code; 4) a "Directed No Credit" for the two courses; and 4) a requirement that any letter of institutional support she might request would include a reference to her Academic

---

[5] Dean Dennis' practice was to withhold information about the accused student's prior Academic Code violations until after the Committee determined whether the student committed a violation in the case before it. ECF No. 35-1 at 2.

Code violation. *Id.* at 112-13.[6] Jane Doe unsuccessfully appealed that decision. ECF No. 35-2 at 114.

Taking into account her plagiarism offense from the year before, the Committee recommended that her penalty for the 2013 violation include: 1) suspension for a semester; 2) a permanent record entry in her internal academic folder; 3) parental notification; and 4) the "withholding of an institutional letter for support for graduate or professional school or employment." *Id.* at 85. Jane Doe would also lose her university privileges during her suspension. *Id.* at 86. The Committee also recommended that the notation of her previous Academic Code violation be restored to her transcript. *Id.* at 86. Dean Dennis summarized the Committee's findings and sanctions in a letter to Jane Doe. *Id.* at 92-93.[7]

Jane Doe appealed the Committee's decision by letter to Margaret Klawunn, Brown's Vice President for Campus Life and Student Services, who was then serving as the interim Dean of the College. ECF No. 15-4 at 2-9; ECF No. 15-1 at 9. Vice President Klawunn upheld the Committee's decision and sanction — except for the Committee's recommendation to reinstate the transcript notation from Jane Doe's

---

[6] Because it was her first violation, Jane Doe was allowed to petition for removal of the transcript notation in her final semester prior to graduating — provided she did not commit any further Academic Code violations. ECF No. 35-2 at 113. Brown permitted her to petition for removal of the transcript notation a semester early — in September 2013, the fall semester of her senior year. *Id.* at 114-115. The request was granted and the transcript notation was removed on October 2, 2013, approximately one month before the mid-term examination at issue here. *Id.* Brown agreed to keep the first notation removed, even after Jane Doe's second violation. ECF No. 15-5 at 3.

[7] T.L. also received a letter from Dean Dennis. ECF No. 35-2 at 95-96.

14

previous violation — and fully explained the reasons for her decision in a letter to Jane Doe. ECF 15-5 at 2-3.

Jane Doe subsequently explored her academic options with Associate Dean of the Curriculum Kathleen McSharry. ECF No. 29-2 at 14. Dean McSharry referred Jane Doe to Rhode Island College (RIC) as an alternative educational institution and advised that she could still have sufficient credits to timely graduate from Brown, provided she satisfied certain requirements. Jane Doe enrolled at RIC, and obtained all of the necessary course credits that allowed her to graduate on time and obtain her degree from Brown University.

## PROCEDURE

Jane Doe filed a thirteen-count complaint (ECF No. 1) against Brown University, Professor Melissa A. Clark, Vice President Margaret Klawunn, and Dean Christopher M. Dennis. She asserted eight counts against Brown: breach of contract, breach of the covenant of good faith and fair dealing, promissory estoppel, negligence, negligent misrepresentation, unreasonable publicity to one's private life, negligent infliction of emotional distress,[8] and intentional infliction of emotional distress; two counts each against Professor Clark and Dean Dennis for negligent and intentional infliction of emotional distress; and one count against Vice President Klawunn for tortious interference with a contract.

---

[8] Jane Doe subsequently withdrew her claims for negligent infliction of emotional distress against all Defendants. ECF No. 22-1 at 53.

The Defendants moved to dismiss the complaint for failure to state a claim, (ECF No. 15) to which Jane Doe objected.  ECF No. 22.  After reviewing the papers, the Court converted the motion into a motion for summary judgment.

> TEXT ORDER: Pursuant to Fed. R. Civ. P. 12(d), the Court will treat Defendants' [15] Motion to Dismiss pursuant to Rule 12(b)(6) as a Motion for Summary Judgment pursuant to Rule 56.  There are a number of documents outside of the pleadings referenced by Defendants in their motion such that it is more appropriate to consider the issues raised under the summary judgment standard and to afford the parties an opportunity to submit rebuttal factual affidavits.  The Court will give all parties an opportunity to present all of the materials that are pertinent to the motion according to the following schedule.  Plaintiff shall submit any materials it wishes the Court to consider on or before December 15, 2015.  Defendants shall submit any material responsive to the Plaintiff's submission on or before December 29, 2015.  The Court will thereafter set any further schedule, if necessary.  · So Ordered by Judge John J. McConnell, Jr. on 12/1/2015

Each party submitted further briefing and submissions.  ECF Nos. 29 and 35.

At the request of the parties, (ECF No. 36 and 37), the Court held oral argument on May 24, 2016.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure governs the summary judgment process.  It provides:

> (a) MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT.
> A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

In evaluating a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences

16

in her favor. *Wilson v. Moulison N. Corp.*, 639 F.3d 1, 6 (1st Cir. 2011). "To defeat a properly supported motion for summary judgment, the nonmoving party must establish a trial-worthy issue by presenting enough competent evidence to enable a finding favorable to the nonmoving party." *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 842 (1st Cir. 1993) (internal quotation marks omitted). This evidence "cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a fact finder must resolve at an ensuing trial." *Mack v. Great Atl. & Pac. Tea Co.*, 871 F.2d 179, 181 (1st Cir. 1989).

## ANALYSIS

Despite the thirteen separate causes of action set forth in the Complaint,[9] Jane Doe's lynchpin allegation is that Brown breached its contract with her by implementing an improper disciplinary procedure and imposing an improper discipline. As a student at a private university challenging the administration's academic dishonesty finding, her suit faces an uphill battle. The relationship between "a student and private university [ ] is essentially contractual in nature," but presents "unique qualities" that require courts to "construe [the contract] in a manner that leaves the school administration broad discretion to meet its educational and doctrinal responsibilities." *Gorman v. St. Raphael Academy*, 853 A.2d 28, 34 (R.I.

---

[9] Counts 1 and 2 are for breach of contract, Count 3 for promissory estoppel, Counts 4 and 5 for negligence, Count 6 for "unreasonable publicity," Counts 7 – 12 for negligent or intentional infliction of emotional distress, and Count 13 for tortious interference with a contract. ECF No. 1 at 25-41.

2004).[10] The school administration has "broad discretion to meets its educational and doctrinal responsibilities." *Id.* "A voluntary association [including private educational institutions] may, without direction or interference by the courts, . . . adopt . . . rules and regulations which will control as to all questions of discipline . . . and its right to interpret and administer the same is as sacred as the right to make them." *Id.* (quoting *Edwards v. Indiana State Teachers Ass'n*, 749 N.E.2d 1220, 1225 (Ind. Ct. App. 2001)). "Private schools must have considerable latitude to formulate and enforce their own rules to accomplish their academic and educational objectives. These rules and regulations generally are binding . . . ." *Id.* at 39. "Courts have long recognized that matters of academic judgment are generally better left to the educational institutions than to the judiciary and have accorded great deference where such matters are at issue." *Mangla v. Brown Univ.*, 135 F.3d 80, 84 (1st Cir. 1998). "Plainly, [judges] may not override [the faculty's professional judgment] unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 225 (1985). The parties agree that the contract at issue is Brown's Academic Code.

---

[10] The Plaintiff having invoked the diversity jurisdiction of this Court pursuant to 28 U.S.C. § 1332 (ECF No. 1 at 4), familiar principles require that Rhode Island state law govern this case substantively. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).

Jane Doe has not raised a single disputed issue of material fact, viewing the facts in the light most favorable to her, that would permit a finding that Brown breached this contract. The Defendants are entitled to judgment on all counts.

## *Contract Claims*

Jane Doe admitted facts that establish an Academic Code violation[11] because:

a. She collaborated with and received assistance from other students in responding to the mid-term take-home exam; and

b. She did not note on the exam that she had collaborated with other students; and

c. Some of the words and ideas she submitted in the take home exam were not the product of her own effort; and

d. She included almost word-for-word another student's answer in her exam and made no citation or notation that the words came from another person; and

e. The work she submitted was not entirely her own ("the thoughts of whose were whose was blurred") ECF No. 15-2; and

f. She "used [another student's] suggestions" *id.*; and

g. She never sought clarification from the instructor about the permissibility of collaboration.

---

[11] Jane Doe repeatedly asserts that Brown mischaracterized her written statement to the Committee and that her statement was not an admission of guilt. In essence, the Court finds that that is a distinction without a difference. In the statement, Jane Doe admits to facts that would constitute an unquestionable violation of the Academic Code.

There is no factual dispute that Jane Doe violated Brown's Academic Code and that she admitted to facts that establish the violation prior to and at the hearing. The Court now turns to Jane Doe's complaints about the process she received.

*Procedural Deficiencies Alleged*

From allegation to punishment, the undisputed evidence shows that the process of Jane Doe's cheating inquiry adhered to the procedures set out in Brown's Academic Code. Her arguments to the contrary fail as a matter of law. Starting in her Complaint and multiplying in her subsequent briefs, Jane Doe mustered a multitude of supposed contractual violations. None of them has any basis in fact or law. The Court addresses these in turn:

First, Jane Doe complains that Brown did not provide her with copies of the work in question and other relevant documents prior to her hearing. ECF No. 1 at 26-28. Her assertion evidences a misreading of the Academic Code. According to the Academic Code, the person alleging the violation (in this case Professor Clark) must provide the relevant materials to the University's Case Administrator responsible for determining if the school should convene a hearing. ECF No. 1-1 at 10. Professor Clark did so. ECF No. 35-2 at 5-23. There is no obligation on the part of the University to provide this information to the accused student.[12]

Second, Jane Doe complains that she did not receive adequate notice of the allegations against her or the potential consequences prior to her hearing. *Id.* at 26,

---

[12] However, it is clear from the record that Jane Doe had copies of the exams in questions as well as others' exams. *See,* ECF No. 35-2 at 38-39. Jane Doe never complained during the process that Brown deprived her of any relevant materials.

28-29. No reasonable fact-finder could agree with her on this issue. Prior to the hearing, she met separately with Professor Clark and Dean Dennis, and was afforded an opportunity to prepare a statement to the Committee. In the statement, she displayed a complete understanding of the cheating allegations about her entire midterm exam. ECF No. 35-2 at 25. At the hearing, she exhibited a complete understanding of the severity of potential consequences, including expulsion. She stated, "I do take full responsibility on that, but I'd really like to continue my academic career here, as I only have one semester left ***** [a]nd I just really would like to continue my term here at Brown, as I'm almost done, and I have one semester left." ECF No. 35-2 at 48-49. Jane Doe has not raised a genuine dispute of material fact on this issue.

Third, Jane Doe complains that Brown did not permit her to consult with a faculty advisor in preparation for the hearing. ECF No. 1 at 26, 29-30. However, Jane Doe never requested to consult with an advisor, and nothing in the Academic Code obligates Brown proactively to assign her an advisor. Jane Doe admits that she previously received a copy of the Academic Code, which sets forth the procedural rights to which each Brown student is entitled in an academic dishonesty hearing. ECF No. 29-2 at 4 ¶ 9. That Code contains no requirement that Brown separately notify accused students of the right to an advisor prior to a hearing, and no such requirement can be written into the Code by the Court. Simply put, Brown spells out all of the process afforded to students accused of an Academic Code violation in the

Academic Code itself, and the responsibility to avail oneself of those provisions rests with the student.

Fourth, Jane Doe complains that Brown did not afford her the right to dispute the evidence against her, to present witnesses in support of her case, or to examine the witnesses against her. ECF No. 1 at 26-27. Again, no reasonable fact-finder could find for Jane Doe on this claim. The most damaging evidence against Jane Doe was her answer to question # 4, which was nearly identical to T.L.'s answer. *See* Appendix. Faced with this quandary (of her own making), Jane Doe submitted a letter to the Committee admitting that she collaborated on the exam and that she appropriated another student's ideas for question # 4 (all without any attribution), and pleading for understanding and mercy. ECF No. 35-2 at 25. She took the same tack at the hearing. *Id.* at 29-54. Having chosen to fall on her sword, she cannot now complain about getting cut.

Brown did not breach its contractual obligations by holding the hearing in the way that it did. Jane Doe was given a full opportunity to dispute the evidence against her. She chose to admit to appropriating T.L.'s ideas in answering question # 4, and to apologize for her conduct. She also chose not to present any witnesses in support of her claim, which was consistent with her strategic approach of admitting a mistake and asking for leniency. Brown did not deny Jane Doe the opportunity to examine witnesses against her, because Professor Clark and T.L. did not appear before the Committee as witnesses against Jane Doe. Professor Clark never met with the Committee, and T.L. appeared before the Committee as part of her own disciplinary

22

proceedings, not as a witness against Jane Doe. Jane Doe would have been free to call those two individuals as witnesses in support of her case. All the evidence that the Committee needed to rely on to make its decision was the blatant similarity between Jane Doe's and T.L.'s exam answers, and Jane Doe's own admissions. Jane Doe's claim to the contrary fails as a matter of law.

Fifth, Jane Doe complains that "Brown failed to conduct a fair and impartial investigation, or in actuality, any investigation whatsoever." ECF No. 22-1 at 40. The evidence, however, establishes otherwise. Brown adhered exactly to the investigation protocols outlined in the Academic Code, starting with a fully documented allegation of a violation by Professor Clark, leading to a thorough screening by Dean Dennis in his capacity as the Case Administrator, progressing to a fair hearing before the Standing Committee on the Academic Code, and concluding with a thoughtful consideration of Jane Doe's appeal by Vice President Klawunn. Jane Doe has raised no genuine issue of material fact about the adequacy of the investigation as contemplated by the Academic Code.

Sixth, Jane Doe complains that "the investigation and Hearing were slanted against Plaintiff as the student accused." ECF No. 22-1 at 40. Jane Doe does not identify the contractual provision in support of this complaint, and raises no material issue of fact that could lead the fact finder to side with her on this unsupported allegation.

Seventh, Jane Doe complains that Brown violated the Academic Code because it "issued a sanction that was unwarranted and disproportionate in light of the

circumstance." There is no evidence to support this assertion. In fact, the evidence strongly supports the opposite. There is no question that Jane Doe violated many provisions of the Academic Code. Moreover, the evidence is overwhelming that the sanction imposed was appropriate given the blatantness of the violations and her recurring dishonesty. The Academic Code clearly lists the specific penalty that Brown imposed on Jane Doe. ECF No. 1-1 at 15. This claim fails too.

Eighth, Jane Doe complains that "Brown's unreasonable delay in providing a decision on Plaintiff's appeal effectively negated any meaningful right to appeal." ECF No. 22-1 at 40. Jane Doe submitted her appeal to Vice President Klawunn on January 13, 2014, and received a response upholding the Committee's decision and sanction on January 23, 2014. ECF No. 32-2 at 98-108. Jane Doe again failed to raise a genuine dispute of material fact about how this 10-day interval between appeal and decision violated any provision of the Academic Code.

Ninth, Jane Doe complains that "Brown University's undefined, vague and inconsistent application of its 'collaboration' policy amounts to arbitrary and capricious conduct sufficient to support an action for breach of contract." ECF No. 29-1 at 23. The Academic Code is clear about the University's policy on collaboration when it comes to examinations, quizzes, and tests — it is considered cheating. ECF No. 1-1 at 8. The only exception is when it "is specifically authorized by the instructor," *id.*, and in those cases, the work "must be clearly marked as the results of collaboration" by the collaborating students. *Id.* at 6. If students are uncertain about whether the instructor permits collaboration, the Academic Code puts the

burden on the student to "consult the instructor of the course or one of the academic deans . . . so as to avoid the charge of academic dishonest." *Id.* at 7. In this case, Jane Doe admitted to collaborating on the final exam. She never claimed that Professor Clark "specifically authorized" the collaboration, nor did she mark her exam as the result of collaboration.

Moreover, with respect to question # 4, "collaboration" is far too generous a term for what Jane Doe did. In her letter to the Committee, she stated: "I was struggling on coming up with innovative ideas for the intervention. I used [T.L.'s] suggestions, and when she was explaining them to me, because we had the same intervention outline, the thoughts of whose were whose was blurred." ECF No. 35-2 at 25. Then, at her hearing, she admitted that T.L. was "spraying out ideas" for question # 4, and Jane Doe was writing them down, all while thinking, "like, this is so simple, like, why didn't I think of this, this idea for this intervention[?]" *Id.* at 34. Jane Doe's admission that the response to question # 4 originated with T.L., and the nearly identical answers that the two students produced, lead to a single conclusion -- that Jane Doe was "[c]opying other students' work during an examination" — a violation separate from collaboration, and one for which the Academic Code makes no exception or justification. ECF No. 1-1 at 8. In any event, Jane Doe's allegation that the University's application of its collaboration policy violates the Academic Code raises no disputed issue of material fact.

Tenth, Jane Doe alleges that she was singled out for "exclusive punishment," in violation of the "Code's stated goal of equal treatment for all." ECF No. 29-1 at 23.

Although Jane Doe does not point to where in the Code this goal is actually stated, the Court is willing to go along, but only so far. She was not singled out. T.L., who was the only other person about whom Professor Clark made a complaint to Dean Dennis, was also punished for violating the Academic Code. ECF No. 35-2 at 95-96. The difference in the two students' punishments is explained by Jane Doe's prior violation and the Committee's findings about the culpability of the two students in this case. *Compare id.* at 92 ("[Jane Doe] acknowledged receiving assistance from [a] classmate in the preparation of [her] exam responses") with *id.* at 95 ("[T.L.] acknowledged providing assistance to [a] classmate after [she] had prepared [her] exam responses"). As to the countless other students who were supposedly collaborating on Professor Clark's midterm, Jane Doe did not provide a single name of such a student to the University, despite being "urged" to do so by the Academic Code. ECF No. 1-1 at 9-10. Jane Doe has not raised a material issue of disputed fact about selective enforcement in violation of the Academic Code, and therefore fails on this claim as a matter of law.

Eleventh, Jane Doe complains that Brown violated the Academic Code because two members of the Standing Committee had heard her first plagiarism case. ECF No. 29-1 at 29. Yet Jane Doe points to no provision in the Code that would forbid members of the Committee from hearing two cases involving the same student. Furthermore, when Jane Doe raised this issue with Vice President Klawunn as part of her appeal, Vice President Klawunn investigated whether any bias might have arisen during the hearing. She reported to Jane Doe that "the two Committee

members from your previous case did not remember that they had heard your previous violation from fall 2012 until they were told about the prior violation." ECF No. 15-5. Because the issue Jane Doe raises is not a violation of any contractual term, explicit or implied, no breach could have occurred.

Twelfth, Jane Doe complains that Brown violated the "implied covenant of good faith and fair dealing" inherent in every Rhode Island contract. ECF No. 1 at 25; *see Now Courier, LLC v. Better Carrier Corp.*, 965 A.2d 429, 435 (R.I. 2009). The purpose of this covenant is to prevent the parties from acting in ways that obstruct the achievement of contractual objectives. *Ide Farm & Stable, Inc. v. Cardi*, 297 A.2d 643, 645 (1972). "The applicable standard in determining whether one has breached the implied covenant of good faith and fair dealing is whether or not the actions in question are free from arbitrary or unreasonable conduct." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 66 F. Supp. 2d 317, 329 (D.R.I. 1999), *aff'd*, 217 F.3d 8 (1st Cir. 2000). Jane Doe has pleaded no facts that would attribute bad faith or unfair dealing to Brown. The Court has concluded above that even when the facts are viewed in the light most favorable to Jane Doe, Brown's investigation into her second academic dishonesty allegation hewed exactly to the Academic Code. It therefore was not arbitrary or unreasonable. Brown is entitled to summary judgment on this claim.

Thirteenth, Jane Doe raises a cause of action for promissory estoppel based on statements made to her during recruiting, and based on the provisions in the Academic Code. This theory is misplaced. Promissory estoppel permits courts to enforce some gratuitous promises that induced acts of reliance by the promisee. *See*

*E. Providence Credit Union v. Geremia*, 239 A.2d 725, 727 (1968). Jane Doe's
Complaint alleges that the head coach of Brown's women's tennis program "advised
[her] that if she decided to attend Brown, she would be academically supported by
both the school and its tennis program. Moreover, [the tennis coach] assured [her]
that she would be treated as a student first and an athlete second and that Brown
would do everything in its power to make her experience at Brown a success." ECF
No. 1 at 5. This was clearly not a promise to look the other way if Jane Doe decided
to cheat, and it has no possible connection to the issues presented in this case. There
is not a scintilla of evidence that Brown did not fulfill the tennis coach's promises. As
to the provisions of the Code, the Court has analyzed these as the terms of an
enforceable contract, not a gratuitous promise, and has concluded that Brown has
abided by them. Jane Doe's claim for promissory estoppel fails as a matter of law.

In sum, Jane Doe has failed to raise a single material issue of disputed fact,
viewed in the light most favorable to her, that would allow a reasonable fact finder to
conclude that Brown breached the Academic Code.[13]

## Tort Claims

Without the lynchpin contract claim, Jane Doe's remaining tort claims easily
fall away.

---

[13] Even if Brown had breached the Code in some way, Jane Doe has not alleged
facts that would make the breach actionable. Jane Doe admitted to facts that
constitute violations of the Academic Code during her meetings with Professor Clark,
Dean Dennis, and in her letter to the Committee before the hearing. Because of her
admissions, even if Jane Doe showed that Brown did not provide her with the
contractually agreed procedures, she could not show that this alleged breached
caused her damages. Her contractual claims would fail as a matter of law.

First, her claim for negligence is a nonstarter. "To properly set forth a claim for negligence, a plaintiff must establish a legally cognizable duty owed by a defendant to a plaintiff, a breach of that duty, proximate causation between the conduct and the resulting injury, and the actual loss or damage." *Willis v. Omar*, 954 A.2d 126, 129 (R.I. 2008) (internal citations omitted). Her complaint identifies the duty of "reasonable care in the conduct of [Brown's] investigation and [ ] adjudication," without a single case to support the legal cognoscibility of this duty. ECF No. 1 at 33. Furthermore, in light of Jane Doe's admissions to conduct constituting violations of the Academic Code, she cannot identify a material issue of disputed fact that would allow a fact finder to conclude that Brown's allegedly unreasonable investigation or adjudication caused her actual loss or damage. This claim fails as a matter of law.

Second, her claim for negligent misrepresentation also fails. ECF No. 1 at 34. This claim concerns the back and forth communications between Jane Doe and Brown about whether she would be able to graduate from Brown in the spring of 2014. *Id.* at 23-25. To establish a prima facie case of negligent misrepresentation, Jane Doe must establish the following elements:

> (1) a misrepresentation of a material fact; (2) the representor must either know of the misrepresentation, must make the misrepresentation without knowledge as to its truth or falsity or must make the representation under circumstances in which he ought to have known of its falsity; (3) the representor must intend the representation to induce another to act on it; and (4) injury must result to the party acting in justifiable reliance on the misrepresentation.

*Mallette v. Children's Friend & Serv.*, 661 A.2d 67, 69 (R.I. 1995) (citations omitted). However, to succeed on this claim, Jane Doe must show that she relied on the alleged misrepresentations to her detriment. *See Zarrella v. Minnesota Mut. Life Ins. Co.*, 824 A.2d 1249, 1258 (R.I. 2003). Jane Doe does not allege a single action she took *in reliance* on Brown's alleged misrepresentation. She attended classes at RIC, contested Brown's position that she was ineligible for graduation, and ultimately graduated on time. Her remaining allegation that she was "prevented [ ] from making the necessary arrangements to fully participate in graduation week activities" is too vague to withstand summary judgment.

Third, Jane Doe alleges that Brown violated her right to be secure from unreasonable publicity given to one's private life, in violation of R.I. Gen. Laws §9-1-28.1(a)(3). Her sole support for this claim is her statement that "[u]pon information and belief, Brown disclosed information about Jane Doe's academic status, academic record and eligibility for graduation to at least one other student, T.L." ECF No. 1 at 35. However, Jane Doe has not pleaded facts or submitted any evidence that support her conclusory assertion that Brown disclosed this allegedly private information to T.L. or anyone else. She does not state who disclosed the information, when or where it happened, how she knows about it, or how it caused her damages. Jane Doe's barebones assertions and the "upon information and belief" nature of her statement fail to nudge her claim over the line from possible to plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This

particular allegation fails to state a claim upon which relief can be granted, and must be dismissed on those grounds.  Fed R. Civ. P. 12(b)(6).

Fourth, Jane Doe pleads a cause of action for intentional infliction of emotional distress against Brown, Professor Clark, and Dean Dennis.  ECF No. 1 at 36, 38-40.  To succeed on this claim, Jane Doe must prove "extreme and outrageous conduct that intentionally or recklessly resulted in causing her severe emotional distress," and "physical symptomatology resulting from the alleged improper conduct." *Vallinoto v. DiSandro*, 688 A.2d 830, 838 (R.I. 1997).  Jane Doe does not claim facts that could rise to extreme and outrageous conduct, nor does she satisfy the physical symptomology requirement of the claim.

"It [is] for the Court in the first instance to determine whether the defendant[s'] alleged conduct, set out in the complaint, could reasonably be regarded as so extreme and outrageous to result in liability." *Clift v. Narragansett Television L.P.*, 688 A.2d 805, 813 (R.I. 1996).  For liability to result under this cause of action, the defendants' conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Hoffman v. Davenport-Metcalf*, 851 A.2d 1083, 1090 (R.I. 2004) (quoting Restatement (Second) Torts § 46 (1965)).  No facts plead by Jane Doe rise to this high standard.  Furthermore, the only nod to physical symptomology in any of Jane Doe's papers is the identical statement in her Complaint and Affidavit that Defendants' actions caused her "physical symptoms including insomnia."  ECF No. 1 at 40; ECF No. 29 at 29-2 ¶ 17.  But "unsupported conclusory

assertions of physical ills contained in the plaintiff['s] complaint [are] insufficient . . . to [ ] successfully resist[ ] . . . [a] motion for summary judgment." *Clift*, 688 A.2d at 813. There is no genuine dispute as to any material fact about this claim, and the Defendants are entitled to judgment as a matter of law.

Fifth, and finally, Jane Doe pleads that Vice President Klawunn "intentionally interfered with the contract between Jane Doe and Brown by failing to uphold the Code and failing to timely issue a response to Jane Doe's appeal." ECF No. 1 at 41. The Court has already determined that as a matter of law, Vice President Klawunn's actions were totally consistent with the Code. Therefore, this claim also fails.[14]

## CONCLUSION

The Court enters summary judgment for Defendants on Jane Doe's claims for breach of contract, breach of the covenant of good faith and fair dealing, promissory estoppel, negligence, negligent misrepresentation, intentional infliction of emotional distress, and tortious interference with a contract. Jane Doe voluntarily withdrew her claims for negligent infliction of emotional distress, (ECF No. 22-1 at 53), and the Court dismisses her claim for unreasonable publicity of one's private life under Fed. R. Civ. P. 12(b)(6). Defendants' Motion (ECF No. 15) is GRANTED, judgment shall

---

[14] Jane Doe, in the alternative, asks this Court to allow her the opportunity to conduct discovery pursuant to Fed. R. Civ. P. 56(d). ECF No. 29-1 at 30-32. This request is denied for two reasons. First, in light of the pleadings and evidence before the Court, further discovery would be futile. Second, the Court afforded both parties time after it converted Brown's motion to dismiss to a summary judgment motion to submit any relevant evidence. Jane Doe never requested additional time to conduct further discovery.

enter for all the Defendants on all counts.  Defendants' Motion to Dismiss the "Jane Doe" Complaint (ECF No. 16) is DENIED AS MOOT.


IT IS SO ORDERED.

_____
John J. McConnell, Jr.
United States District Judge

June 27, 2016

# APPENDIX

## Jane Doe's answer to question # 4:

  In order to address the issue surrounding safe sex education, schools should incorporate mandatory safe sex education as part of the health class curriculum on a statewide scale. This way, the information that is provided to adolescents is consistent, and therefore can be more accessible. This intervention could help improve the awareness surrounding the issue of safe sex practices. In order for children to retain and understand this information, it should be reinforced through several years of safe sex education. Therefore, it is important to provide this form of education to younger populations of adolescents. This form of education should start as early as sixth grade, or middle school. This would be the best way to proactively reinforce this education. This educat[ ]ion would continue up until twelfth grade and would be presented with the same information regarding safe sex practices. By presenting the information consistently, this allows adolescents to be able to retain and comprehend the importance of safe sex.

  It is important to acknowledge adolescent pregnancies as an important way to prevent the excessive gestational weight gain because this population is at risk for high-risk pregnancies. This is a direct determinant to the health issue of excessive maternal GWG. The education and health departments at each school should be responsible for not only education the children about sexual education and safe sex practices, but should also provide education to those who are pregnant. These departments at the schools should provide the resources necessary to educate them further on adolescent pregnancies. By helping these adolescents who are pregnant, this can help reduce high-risk pregnancies. State health departments should work with their sexual education programs in order to provide students with information and services that are easily accessible to all students of all ages regarding adolescent pregnancies.

ECF No. 35-2 at 22. (The parties provided the Court with a more legible version of Jane Doe's answer than the one stored on ECF, which the Court used to transcribe the answer here.)

**T.L's answer to question # 4:**

In order to adequately address the issue surrounding sexual education, or lack thereof, there should be mandatory incorporation of safe sex education as part of health class curriculums nationally. That way, the information being provided to adolescents is consistent, and therefore more comprehensible and accessible. This can perhaps improve the awareness of the importance of safe sex practices. In addition to improving awareness, it is important to also consider providing this form of education to younger populations of adolescents. In order for children to retain and understand the information being provided to them, it must be reinforced through several years of sexual education. Starting this education as early as sixth grade, or middle school, would be the most proactively effective way to reinforce the information. By continuing this education up until graduation, or 12th grade, and consistently presenting the same information regarding safe sex practices, this allows adolescents the opportunity to retain and solidify an understanding of the importance of safe sex.

It is important to acknowledge adolescent pregnancies an important way to prevent the proliferation of excessive GWG because this demographic is at greatest risk for high-risk pregnancies, a direct determinant to the health issue at hand. The education and health departments at each school should be charged with the responsibility to not only education children about sexual education and safe sex practices, but also provide those who are pregnant with resources necessary to educate them further on adolescent pregnancies and the importance of stress management. Health departments should work in tandem with the sexual education programs to supply students with information and services that are readily accessible to all students of all ages.

ECF No. 35-2 at 15-16.